**In re STATE STREET ASSOCIATES, L.P., Debtor.**

**In re State Street Houses, Inc., Debtor.**

**State Street Associates, L.P. and State Street Houses, Inc., Plaintiffs,**

**v.**

**New York State Urban Development Corporation, Defendant.**

**Bankruptcy Nos. 04–63673, 04–63672 04–80217.**

United States Bankruptcy Court, N.D. New York.

March 23, 2005.

Hancock & Estabrook, LLP, Daniel Berman, of counsel, Syracuse, NY, for Debtors/Plaintiffs.

Nixon Peabody LLP, Robert N.H. Christmas, of counsel, New York City, Nixon Peabody LLP, William S. Thomas, Jr., of counsel, Rochester, NY, for defendant.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Before this Court is a Motion to Dismiss, pursuant to Federal Rule of Bankruptcy Procedure 7012 ("Fed.R.Bankr.

P.") incorporating Federal Rule of Civil Procedure 12(b)(6) ("Fed.R.Civ.P."), filed by New York State Urban Development Corporation ("Defendant" or "UDC") on September 13, 2004, in connection with a complaint filed against UDC on August 6, 2004, by State Street Associates, L.P. ("SSA") and State Street Houses, Inc. ("SSH"), collectively known as the "Debtors." The Debtors commenced this Adversary Proceeding against UDC, pursuant to §§ 541 and 542 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"), seeking the turnover of a certain portion of settlement proceeds (the "Settlement Proceeds") currently held by UDC, and for an accounting from UDC with respect to the Settlement Proceeds. This Adversary Proceeding arises in two voluntary cases filed pursuant to Chapter 11 of the Code by the Debtors on May 21, 2004. The cases have been jointly administered virtue of an Order signed on May 25, 2004. On November 18, 2004, the Debtors filed a response in opposition to UDC's Motion to Dismiss ("Dismissal Motion"). UDC then filed a reply on November 22, 2004, in further support of its Dismissal Motion. The Court heard oral argument on the Dismissal Motion on November 29, 2004 in Utica, New York. At the conclusion of the oral argument, the Court afforded the parties an opportunity to submit memoranda of law by December 13, 2004.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), and 157(b)(2)(A), (E), and (O).

## FINDINGS OF FACT

The complaint alleges the following facts, which for the purpose of ruling on

UDC's Fed.R.Civ.P. 12(b)(6) motion, are taken as true. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). SSH is a New York corporation and legal title owner of the Kennedy Plaza Apartments ("Kennedy Plaza"), a subsidized residential apartment complex in Utica, New York. SSA is a New York limited partnership and is SSH's affiliate. SSA is the operator of Kennedy Plaza. UDC is a New York public benefit corporation.

On July 21, 1971, SSH borrowed $8,105,000 from UDC to construct and operate Kennedy Plaza. Since that date, UDC has loaned the Debtors additional money, and the parties have modified and consolidated their loan agreements several times. UDC secured its loans with a first mortgage lien containing an assignment-of-rents clause on the Kennedy Plaza property.

In the construction of Kennedy Plaza, a mortar additive manufactured by Dow Chemical ("Dow"), known commercially as "Sarabond," was utilized. The mortar subsequently failed, causing structural damage to the apartment complex.

In 1983, UDC and SSA, along with two other similarly damaged UDC financed parties, filed a civil action against Dow for the Sarabond failure in the United States District Court for the Southern District of New York (the "Dow Litigation"). *See Loan Restructuring Agreement § 5.01 (Exhibit B attached to UDC Motion to Dismiss).* They sought compensatory and punitive damages from Dow.

On July 31, 1985, the Debtors (along with the other plaintiffs in the Dow Litigation) executed Powers of Attorney ("POAs") authorizing UDC to direct and manage the Dow Litigation on their behalf and to take "any and all acts necessary

and appropriate with respect to any settlement of the litigation."[1]

On August 5, 1985, SSA borrowed $2,173,809 from the United States Department of Housing and Urban Development ("HUD"), under its Flexible Subsidy Loan Program. In return, SSA gave HUD a promissory note (the "HUD Note"), which accumulates interest at an annual, noncompounded rate of 1%. SSA could repay the loan from its accumulated profits or from its general funds. The Note matures in July 2025. SSA used the loan proceeds to finance repairs on Kennedy Plaza resulting from the Sarabond damage. UDC also loaned SSH additional money in exchange for a Building Loan Note in the principal amount of $2,100,000.[2] SSH also used the loan proceeds to repair Kennedy Plaza's masonry.

The Debtors also entered into a "Loan Restructuring Agreement" (the "LRA") dated July 31, 1985,[3] in consideration of UDC granting the Debtors a ten year forbearance period from the closing date of the financing. *See LRA § 2.01 (Exhibit B attached to UDC Motion to Dismiss)*. In the LRA, the Debtors assigned to UDC any settlement or award they might receive from the Dow Litigation; UDC would then use the assigned funds to pay off certain debts owed by the Debtors. *See id.* at § 5.02. The LRA prioritized the payments. *See id.* The first priority was the payment of the litigation expenses UDC incurred as the SSA's attorney in the Dow Litigation.[4] *See id.* The second priority under the LRA's payment allocation plan was the HUD Note, along with the Note's accrued interest. *See id.* Payment of UDC's Building Loan Note was the third priority. *See id.* If any funds remained after a total of eight prioritized payments, the allocation plan would distribute 60% of the funds to UDC and 40% to SSA's Managing General Partner. *Id.*

On October 7, 1988, SSA purportedly revoked for cause the POA given to UDC to prosecute the Dow Litigation. *See Exhibit B attached to UDC Reply in Further Support of Motion to Dismiss Complaint.* However, on April 9, 1991, UDC and SSA agreed, in writing, to reinstate the POA and to make several modifications to the LRA. *See Appendix 1 attached to Debtors' Supplemental Memorandum of Law in Opposition to UDC's Motion to Dismiss.* They agreed to make the LRA modifications effective on August 1, 1991.[5] *See id.*

1. The Debtors' complaint states that the Debtors signed POAs, but the POA UDC attached as Exhibit C in its Motion to Dismiss shows that only SSA granted UDC a POA.

2. The Debtors' complaint does not state when this loan occurred.

3. It appears from the Debtors' complaint that the parties entered into the LRA after the Debtors received the HUD loan on August 5, but backdated the LRA to July 31.

4. Under the first priority payment, UDC would also pay the New York State Mortgage Loan Enforcement and Administration Corporation ("MLC") and the New York State Project Finance Agency ("PFA") for the litigation costs they apparently incurred in the Dow Litigation. PFA was a mortgage lender to the Debtors as well. PFA is a New York State agency that provides financial assistance with real estate development throughout New York. MLC services UDC and PFA's mortgages on their behalf.

5. The Debtors' complaint neither alleged the POA's revocation in 1988 nor its reinstatement in 1991. UDC mentioned the revocation in its Reply in Further Support of Motion to Dismiss Complaint. UDC also supplied a copy of the written revocation as an exhibit. The Debtors mentioned the POA reinstatement in oral argument before the Court and attached the written reinstatement as an appendix to its Supplemental Memorandum of Law.

Acting under the POAs, UDC, over the Debtors' objections, finalized a settlement with Dow in April of 1991.[6] Dow paid UDC $20,000,000 for general damages (the "Sarabond Settlement"), and UDC released all of the Debtors' substantial punitive damage claims. UDC received the Sarabond Settlement that same month and held the funds for the benefit of all of the plaintiffs in the Dow Litigation as Attorney–in–Fact, Trustee, and Escrow Agent. There was a dispute among all the plaintiffs in the Dow Litigation over the distribution of the proceeds, and it was not until July 1992, that the Debtors and UDC entered into a settlement agreement (the "Settlement Agreement"). This Settlement Agreement provided that the Debtors would receive $7,056,000 as their share of the Sarabond Settlement. It also included an Amendment to the LRA (the "Amended LRA"), backdated so that it was also purported to be effective on July 31, 1991. UDC provided an additional five year forbearance period in the Amended LRA. *See Amended LRA § 6 (Exhibit D attached to UDC Motion to Dismiss).* The Amended LRA also revised the Sarabond Settlement priorities, making the amount payable to HUD the first, rather than second, priority:

> Any award...as a result of the [Dow] Litigation, or any portion of a settlement, or any portion of a settlement of the [Dow] Litigation...shall be assigned to UDC and allocated and distributed...in the following order of priority: (a) To accrued interest on the HUD Flexile Subsidy Loan, then to the payment of the Two Million, One Hundred Seventy-three Thousand, Eight Hundred Nine ($2,173,809) Dollars principal thereof;...

*Amended LRA § 10 (Exhibit D attached to UDC Motion to Dismiss).*

At the time of the Settlement Agreement, UDC orally advised the Debtors that the Debtors must pay UDC $2,173,809 from the Debtors' Sarabond Settlement share, which UDC in turn would use to pay the HUD Note immediately as the first priority distribution under the Amended LRA. Thereafter, the Debtors believed that UDC had distributed the Settlement Proceeds in accordance with the Amended LRA, which included repaying the $2,173,809, plus accrued interest due under the HUD Note, as a first priority.

In December of 1998, six years after the Settlement Agreement, the Debtors inquired of UDC as to the distribution of the Settlement Proceeds. UDC responded that it had paid the designated portion of the Settlement Proceeds to HUD in satisfaction of the HUD Note. UDC then subsequently reversed its position and admitted that it had not yet paid HUD.[7] UDC claimed that it did not have any obligation to pay over the Settlement Proceeds to HUD in satisfaction of the principal or interest due under the HUD Note until the year 2025, when the HUD Note matures. The Debtors allege that UDC has since admitted in open court that it made a "business judgment" decision not to repay the HUD Note and decided to "invest" the Settlement Proceeds for its own account, thereby benefitting from the low 1% non-compounded interest rate due on the HUD Note.

The Debtors filed the instant Adversary Complaint seeking: (1) turnover of the Settlement Proceeds, plus accrued interest

---

**6.** The Debtors' complaint does not state the exact date when the Sarabond Settlement occurred.

**7.** The Debtors' complaint does not state when UDC reversed its position nor does it describe how UDC communicated this to the Debtors.

earned on the proceeds since 1991; and (2) an accounting from UDC of the Debtors' $7,056,000.00 Sarabond Settlement share.

## ARGUMENTS

The Debtors' argument in support of their turnover claim asserts that neither the POAs' terms nor the LRA nor the Amended LRA allowed UDC to retain or use the Settlement Proceeds for its own benefit. The POAs created a fiduciary relationship between UDC and the Debtors. UDC holds the Settlement Proceeds on behalf of the Debtors in a fiduciary capacity and is, therefore, not entitled to claim any ownership in them or use the Settlement Proceeds for its own benefit. UDC, it is alleged, violated its fiduciary obligations when it did not pay HUD, as it agreed to in the Amended LRA, and invested the Settlement Proceeds for its own benefit. This deprived the Debtors of the benefit of the HUD Note's low interest rate and the 2025 due date. The Settlement Proceeds and their accrued interest belong to the Debtors and are property of their bankruptcy estates pursuant to Code § 541(a)(1). UDC's concealment and misrepresentation of the facts surrounding satisfaction of the HUD Note caused the Debtors to delay in bringing this action.

In the Debtors' second cause of action, they request the Court direct UDC to provide them with a complete accounting concerning their $7,056,000 Sarabond Settlement share, which is in UDC's possession.

UDC argues that the Debtors have failed to state a cause of action upon which relief may be granted. UDC contends that New York State's statute of limitations time-bars the Debtors' claims for turnover and an accounting. UDC claims that the plain language of the LRA and Amended LRA defeats the Debtors' turnover claim. UDC also asserts that in ruling on a motion to dismiss a Chapter 11 case previously filed by SSH in the Southern District of Florida, the United States Bankruptcy Court ("the Florida Bankruptcy Court") ruled that the Sarabond Settlement Proceeds were not property of the debtor's estate because the funds had been assigned to UDC. *State Street Houses, Inc. v. New York State Urban Dev. Corp. (In re State Street Houses, Inc.)*, 305 B.R. 726, 734–37 (Bankr.S.D.Fla.2002), *aff'd*, 305 B.R. 738 (S.D.Fla.2003), *aff'd*, 356 F.3d 1345 (11th Cir.2004).[8] That decision, UDC argues, bars the Debtors' claims in this

---

**8.** On July 16, 2002, SSH filed a voluntary Chapter 11 petition in the Florida Bankruptcy Court. One month later, SSH commenced an adversary proceeding in that court, titled *State Street Houses, Inc. v. New York State Urban Development Corp.* In the adversary proceeding, SSH sought, *inter alia*, turnover of the $2,173,809 of the Sarabond Settlement share, plus accrued interest, which UDC was supposed to use to repay the HUD loan. UDC filed a motion to dismiss the entire Chapter 11 petition pursuant to Code § 1112 because it alleged that SSH had not filed in good faith. The motion alternatively sought to change the Chapter 11 case's venue. The Florida Bankruptcy Court granted UDC's motion and dismissed SSH's Chapter 11 case for cause, concluding that SSH had not filed in good faith. Following the guidelines created

by *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly)*, 849 F.2d 1393, 1394 (11th Cir.1988), the Florida Bankruptcy Court examined several factors in evaluating whether SSH filed its Chapter 11 petition in bad faith in an attempt to avoid foreclosure of Kennedy Plaza. One of the factors was whether SSH had only one true asset, which was Kennedy Plaza. Although SSH claimed as an asset the money owed on the HUD Note and a claim against UDC for damages, the Florida Bankruptcy Court did not consider them an asset. That court ruled that the evidence suggested that those funds were more appropriately considered an asset of HUD because those funds were allocated only to HUD under the LRA and the Amended LRA. *State Street Houses*, 305 B.R. at 734.

Court on grounds of res judicata and collateral estoppel. UDC argues that the Debtors' claim for an accounting should also fail because the Debtors have alleged no set of facts nor any contractual provision to support their supposed right to an accounting.

## DISCUSSION

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim, the Court merely assesses the legal feasibility of the complaint. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998). The Court can only grant a motion to dismiss if it appears beyond doubt that the Debtors can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Additionally, the Court must only consider the facts appearing on the face of the complaint and any documents attached to or incorporated by reference in the complaint. *Cooper v. Parsky,* 140 F.3d at 440. If the Court considers matters outside of the complaint, it must then treat the motion as one for summary judgment under Fed.R.Civ.P. 56 and give the party opposing the motion notice and an opportunity to submit pertinent material and conduct discovery, if necessary. Fed.R.Civ.P. 12(b); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984).

 In their complaint, the Debtors neither alleged the POA's revocation in 1988 nor its reinstatement in 1991. UDC referred to the revocation in its Reply in Further Support of Motion to Dismiss Complaint. UDC also supplied a copy of the written revocation as an exhibit. The Debtors mentioned the POA reinstatement in oral argument before the Court and attached the written reinstatement as an appendix to its Supplemental Memoran-

dum of Law. However, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated by reference. *Cortec Indus., Inc., v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991). Even if the complaint does not incorporate the document by reference, the Court may consider it when the complaint "relies heavily upon its terms and effect," rendering the document integral to the complaint. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). Although the Debtors' complaint does not incorporate the reinstated POA, it is integral to the complaint because the complaint relies heavily on its terms and effect in showing that the parties had a fiduciary relationship. *See Int'l Audiotext,* 62 F.3d at 72. The Court may consider the revoked POA because the reinstated POA contains language referring to the document purportedly revoking the POA.

In *Cortec,* the Second Circuit noted that the harm that can arise when a court considers material extraneous to a complaint is the plaintiff's lack of notice that the court may consider the material in ruling on a Fed.R.Civ.P. Rule 12(b)(6) motion. *Cortec,* 949 F.2d at 48. This is why in those situations courts convert Fed. R.Civ.P. Rule 12(b)(6) motions into Fed. R.Civ.P. Rule 56 motions. *Id.* However, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Id.* In the instant case, SSA was the party who revoked the POA in 1988, and the Debtors were the party who submitted the reinstated POA document. Debtors therefore

knew of both documents and had notice of them.

### 1. Statute of limitations

■■ The Code does not impose a statute of limitations on turnover claims arising under §§ 542 and 543. *In re Mushroom Transp. Co.*, 382 F.3d 325, 337 (3d Cir.2004). The parties do not dispute that the Debtors' turnover claim, which is based on breach of a fiduciary duty created by the POAs, is subject to New York State's statute of limitations. They only disagree over which statute of limitations applies to the claim. Unfortunately, as *Pereira v. Centel Corp. (In re Argo Communications)*, 134 B.R. 776, 787 (Bankr. S.D.N.Y.1991), pointed out, "New York law does not provide any single limitations period for breach of fiduciary duty claims." Under New York law (New York Civil Practice Law and Rules)("NYCPLR"), a three-year statute of limitations governs a breach of fiduciary duty claim if the action seeks monetary damages, and a six-year period governs such a breach if the action seeks equitable relief. *Cooper v. Parsky*, 140 F.3d at 440–41; *Loengard v. Santa Fe Indus.*, 70 N.Y.2d 262, 519 N.Y.S.2d 801, 514 N.E.2d 113, 115 (1987). The Debtors seek equitable relief by asking the Court to compel turnover of the Settlement. *See, e.g., Walker v. Weese*, 286 B.R. 294, 299 (D.Md.2002) (explaining that requiring turnover is merely the bankruptcy court's means of enforcing its decisions, and it is therefore equitable in nature); *In re Kabler*, 230 B.R. 525, 526 (Bankr.E.D.N.C. 1999) (holding that turnover is an equitable remedy). A turnover claim, which is not based on fraud, would thus be subject to NYCPLR § 213(1)'s six-year limitations period. *See, Whitney Holdings, Ltd. v. Givotovsky*, 988 F.Supp. 732, 741 (S.D.N.Y. 1997); *Loengard*, 70 N.Y.2d 262, 519 N.Y.S.2d 801, 514 N.E.2d at 115.

■■ However, a party must commence a fraud based turnover claim within six years of the date of the fraudulent act or two years from the date the party discovered the fraud, or could, with due diligence, have discovered the fraud. *See NYCPLR § 213(8); Congregacion De La Mision Provincia De Venezuala v. Curi*, No. 96 CV 1914, 1998 WL 372468, at *9 (E.D.N.Y. Apr. 24, 1998); *Ghandour v. Shearson Lehman Bros., Inc.*, 213 A.D.2d 304, 624 N.Y.S.2d 390, 391–92 (N.Y.App. Div.1995). When a plaintiff bases the breach of fiduciary duty on allegations of fraud, as is the case here, the claim's accrual depends on whether the fraud allegation is merely incidental to the claim asserted. *Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157, 165 (N.Y.App.Div. 2003); *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 490 N.Y.S.2d 190, 192–3 (N.Y.Sup.Ct.1985), *aff'd*, 67 N.Y.2d 981, 502 N.Y.S.2d 1001, 494 N.E.2d 106. A fraud allegation can be incidental when the plaintiff's claim is based upon a contract and the only purpose that serves the plaintiff in pleading fraud is to avoid a statute of limitations defense. *Brick v. Cohn–Hall–Marx Co.*, 276 N.Y. 259, 11 N.E.2d 902, 904 (N.Y.1937). If the fraud allegation is only incidental to the claim, courts will not apply the fraud statute of limitations. *Id.* Furthermore, the fraud discovery rule only applies to claims of actual fraud, in other words, fraud claims alleging an intent to deceive. *Whitney Holdings*, 988 F.Supp. at 744. Constructive fraud claims, such as when a fiduciary does not disclose facts it is obligated to disclose, accrue upon breach. *Id.* In *Bastys v. Rothschild*, No. 97 Civ. 5154, 2000 WL 1810107, at *34 n. 18 (S.D.N.Y. Nov. 21, 2000), the District Court noted that "[t]he question of when a breach of fiduciary duty claim accrues has been complicated by certain federal cases stating that the discovery rule applies in all breach of fidu-

ciary cases, without mention of the distinction between fiduciary claims involving fraud and those without allegations of fraud." The District Court explained that almost all the cases whose language might be read to suggest that the discovery rule applies to all fiduciary claims involved alleged breaches of fiduciary duty based on fraud. *Id.* This Court agrees with the District Court's conclusion that "the discovery rule applies to fiduciary duty claims involving fraud, while the breach rule applies to other fiduciary duty claims." *Id. See also Dymm v. Cahill,* 730 F.Supp. 1245, 1265 n. 7 (S.D.N.Y.1990).

■ UDC committed the alleged fraudulent act in 1992 when it advised the Debtors that it would immediately pay off the HUD Note as the first priority under the Amended LRA. To satisfy the fraud statute of limitations, the Debtors needed to commence their fraud based cause of action within two years after discovering the fraud or could, with due diligence, have discovered the fraud. *See NYCPLR § 213(8).* The Debtors never allege the date when they discovered the fraud. Their complaint merely states that "Defendant subsequently reversed its position and admitted that the Settlement Proceeds had not yet been paid to HUD..." *Complaint ¶ 22.* According to the Debtors' complaint, the earliest the Debtors discovered the fraud would be December of 1998, six years after the alleged fraudulent act. It would appear that with due diligence, the Debtors could have discovered the fraud at a much earlier time. In the Debtors' Supplemental Memorandum of Law, they attached a request they made in September 1998 to UDC pursuant to New York's Freedom of Information Law, Public Officers Law, art. 6, §§ 84–90. As a public corporation, UDC is subject to the Freedom of Information Law. This law states in part the following: "[e]ach entity subject to the provisions of this article, within five business days of the receipt of a written request for a record reasonably described, shall make such record available to the person requesting it, deny such request in writing or furnish a written acknowledgment of the receipt of such request and a statement of the approximate date when such request will be granted or denied..." *New York's Freedom of Information Law, Public Officers Law, art. 6, § 89(3).* The New York Freedom of Information Law forced UDC to respond to the Debtors' request for UDC's records concerning the Sarabond Settlement. The Debtors did not have to wait from 1992 until 1998 until they made this request. This Court, therefore, finds that the Debtors' complaint is not timely under the fraud statute of limitations.

■ Code § 108(a) provides a bankruptcy trustee a two year extension of a limitations period applicable to any cause of action it may have if the limitation period has not expired on the date of the filing of the debtor's petition. *Greenwald v. Axelrod (In re Greenwald),* 48 B.R. 263, 273 (S.D.N.Y.1984). The Code extends to debtors-in-possession this tolling right bestowed upon trustees. *See* 11 U.S.C. § 1107(a). *See also Tibbetts v. Eckert Seamans Cherin & Mellott,* 272 B.R. 448, 449 (W.D.Pa.2001). Code § 301 states that "the commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." SSH filed a voluntary Chapter 11 petition on July 16, 2002. *In re State Street Houses,* 305 B.R. 726, 732 (Bankr.S.D.Fla.2002). On May 21, 2004, SSH filed its second voluntary chapter 11 petition for relief. SSA also filed a voluntary chapter 11 petition for relief on that same day. Both the six year statute of limitations and the two year fraud statute of limitations, which time-bar the Debtors' turnover claim, ex-

pired prior to the filing of either case. Code § 108(a) is therefore not applicable.

In New York the doctrine of equitable estoppel may bar a defendant from asserting statute of limitations as a defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action. *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713, 716 (N.Y.1978). *See also Whitney Holdings*, 988 F.Supp. at 746. However, the practical effect of applying equitable estoppel to the turnover claim is the same as the application of the fraud statute of limitations to the Debtors' turnover claim. *See Whitney Holdings*, 988 F.Supp. at 746. They both toll the cause of action until the Debtors' discovery of the claim. To successfully assert equitable estoppel, the Debtors have the burden of establishing that they brought the action within a reasonable time after learning of the fraud, misrepresentations or deception. *See Overall v. Estate of Klotz*, 52 F.3d 398, 404 (2d Cir.1995); *Simcuski v. Saeli*, 406 N.Y.S.2d 259, 377 N.E.2d at 717. The Debtors have failed to meet this burden because their complaint does not provide the specific date when the Debtors discovered UDC's alleged fraud, misrepresentations or deception.

In their turnover claim, the Debtors also allege that the POAs created a trustee-beneficiary relationship once UDC received the Settlement Proceeds as a trustee. An attorney holds money he or she collects for a client as a trustee. *See Hafter v. Farkas*, 498 F.2d 587, 589 (2d Cir.1974); *Matter of Anschell*, 53 A.D.2d 297, 385 N.Y.S.2d 771, 772 (N.Y.App.Div. 1976). There are sufficient facts in the Debtors' complaint supporting the inference, at least, that there was an attorney-client relationship. An attorney-client relationship arises only when one contacts an attorney in the attorney's capacity as such

for the purpose of obtaining legal advice or services. *Priest v. Hennessy*, 51 N.Y.2d 62, 431 N.Y.S.2d 511, 409 N.E.2d 983, 986 (N.Y.1980). After signing the POA, SSA presumably contacted UDC for the purpose of obtaining the legal services UDC agreed to perform in the POA. The act of directly rendering legal advice, services, or assistance forms the touchstone of an attorney-client relationship. *Brandman v. Cross & Brown Co.*, 125 Misc.2d 185, 479 N.Y.S.2d 435, 437 (N.Y.Sup.Ct.1984). Here, UDC did render legal services for SSA. An "attorney's appearance in a judicial or quasi-judicial proceeding creates a presumption that the attorney-client relationship exists." *Cooke v. Laidlaw, Adams & Peck, Inc.*, 126 A.D.2d 453, 510 N.Y.S.2d 597, 599 (N.Y.App.Div.1987). UDC did appear before the United States Southern District Court of New York in the Dow Litigation. The absence of a fee arrangement is a general indication that no attorney-client relationship has been established. *Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F.Supp. 360, 366 (S.D.N.Y.1992). The LRA did provide for reimbursement to UDC for its Dow Litigation costs and expenses, which was to be in the same proportion as SSA's award bore to the total of the awards or settlements to the other Dow plaintiffs. *See LRA § 5.02(a) (Exhibit B attached to UDC Motion to Dismiss).*

A POA does not necessarily create an attorney-client relationship, however. *Sun Studs, Inc. v. Applied Theory Assocs.*, 772 F.2d 1557, 1568 (Fed.Cir. 1985). Here though, SSA, the principal, authorized UDC, its agent, to collect the Settlement Proceeds belonging to SSA and hold the proceeds on SSA's behalf. Under New York law a trust is created when four requirements are met: the trust has a beneficiary, a trustee, a trust res, and there has been delivery of the res. *In re*

*Gillette,* 195 Misc.2d 89, 756 N.Y.S.2d 835, 837 (N.Y.Sur.2003). The alleged facts indicate that SSA is the beneficiary; UDC is the trustee; the Settlement Proceeds are the trust res; and delivery of the res occurred when UDC received the Settlement Proceeds. In support of this conclusion, a Virginia Bankruptcy Court ruled that persons acting under powers of attorney are technical trustees and serve in a fiduciary relationship to their principals. *In re Barwick,* 24 B.R. 703, 705–06 (Bankr. E.D.Va.1982) (interpreting Virginia law).

■■■ UDC's breach of its fiduciary obligations as a trustee would then not commence until it openly repudiated its obligations to the beneficiary. *See In re Barabash's Estate,* 31 N.Y.2d 76, 334 N.Y.S.2d 890, 286 N.E.2d 268, 270 (1972). Courts toll the statute of limitations when a beneficiary sues a trustee of an express trust (as opposed to a constructive trust) for breach of its fiduciary obligations because the beneficiary should be entitled to rely upon a fiduciary's skill without having to monitor the fiduciary's services or interrupt a relationship of trust and confidence by instituting suit. *See Golden Pac. Bancorp v. F.D.I.C.,* 273 F.3d 509, 519 (2d Cir.2001); *Lammer v. Stoddard,* 103 N.Y. 672, 9 N.E. 328, 329 (N.Y.1886). The Debtors allege that UDC did not openly repudiate its fiduciary obligations until UDC acknowledged to the Debtors that it had not paid the $2,173,809 to HUD and refused to do so. According to the Debtors' complaint, the earliest date in which UDC made this statement was December 1998. The Debtors would then have six years from that date to file a complaint, which makes timely the Debtors' August 6, 2004, complaint seeking turnover based upon a breach of UDC's fiduciary duty.

2. *Res judicata*

■■■ To determine whether the doctrine of res judicata bars this Adversary Proceeding, the Court must consider whether: (1) there was a prior decision that was a final judgment on the merits; (2) the litigants were the same parties; (3) the prior court was a court of competent jurisdiction; and (4) the causes of action were same. *Corbett v. MacDonald Moving Servs.,* 124 F.3d 82, 87–88 (2d Cir. 1997). Courts may invoke res judicata only after careful inquiry. *Brown v. Felsen,* 442 U.S. 127, 132, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Res judicata prevents the subsequent litigation of any defense or ground for recovery that was available to the parties in the original action, whether or not it was actually litigated or determined. *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 727 (2d Cir.1981).

■■■ The causes of action in this Adversary Proceeding and the issues that faced the Florida Bankruptcy Court in *In re State Street Houses* are not the same. *See In re State Street Houses,* 305 B.R. at 734–37. In determining what constitutes the same cause of action, the Second Circuit considers several related factors, not any one of which is necessarily dispositive, including: (1) whether the same transaction or connected series of transactions is at issue; (2) whether the same evidence is needed to support both claims; and (3) whether the facts essential to the second cause of action were present in the first cause of action. *See N.L.R.B. v. United Techs. Corp.,* 706 F.2d 1254, 1260 (2d Cir. 1983). In the Florida case, the defendants moved to dismiss SSH's chapter 11 case as a bad faith filing pursuant to Code § 1112(b)(2). *See In re State Street Houses,* 305 B.R. at 728. Here, the Debtors seek turnover and an accounting. The evidence needed to support the Code § 1112(b) motion in *In re State Street*

*Houses* is not the evidence necessary to support the turnover and accounting claims here. In making its decision, the Florida Bankruptcy Court was not required to determine whether SSH or UDC had a greater right to the Settlement Proceeds before they were paid to HUD, notwithstanding the fact that the Florida Bankruptcy Court did observe that the Debtor's sole asset was Kennedy Plaza. *See id.* at 735–36. Therefore, res judicata does not apply.

### 3. Collateral estoppel

 In order to apply the doctrine of collateral estoppel to bar re-litigation of an issue, (1) the issues in both proceedings must be identical; (2) the issue in the prior proceeding must have been actually litigated and actually decided; (3) there must have been a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits. *Levy v. Kosher Overseers Assoc. of Am., Inc.,* 104 F.3d 38, 41 (2d Cir.1997). Collateral estoppel places termination of litigation ahead of the correct result. *Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996). For this reason, courts narrowly tailor the doctrine to ensure that it applies only where the circumstances indicate the issue estopped from further consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness. *Id.*

 In *In re State Street Houses,* the Florida Bankruptcy Court reviewed a motion to dismiss SSH's chapter 11 case as a bad faith filing; that court never conducted a trial in connection with SSH's adversary proceeding seeking turnover of the $2,173,809 Sarabond Settlement share. It did not have to determine whether the Debtors or UDC had a greater right to the

Settlement Proceeds. *See In re State Street Houses,* 305 B.R. at 735–36. The Florida Bankruptcy Court observed that the evidence "suggests that the funds at issue...are more appropriately considered an asset of HUD and not Debtor because those funds are allocated only to HUD under the terms of the 1985 Loan Restructuring Agreement and the 1991 Amendment." *Id.* at 735. However, as indicated, the Florida Bankruptcy Court did conclude that Kennedy Plaza was the Debtor's only asset. *Id.* This determination that SSH's bankruptcy case was a single asset real estate case was but one of many factors the Florida Bankruptcy Court considered in its decision to dismiss the Chapter 11 case. *See id.* at 734–37. For these reasons, collateral estoppel does not bar the Debtors' instant Adversary Proceeding.

### 4. Parol Evidence Rule

In April of 1991, UDC and the Debtors executed a contract (the Amended LRA) in which UDC agreed to reinstate the POA in consideration for the Debtors executing the Settlement Agreement. The contract modified the original LRA's terms. In July of 1992, the parties then entered into the Settlement Agreement and at the same time, signed the Amended LRA, backdating it to July 1991. The key language in the Amended LRA is a merger clause, which states:

> This Agreement (a) shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns, (b) is a contract among the parties hereto for their mutual benefit and shall not create any third party beneficiary rights and (c) supersedes all prior understandings between the parties and constitutes, together with the Agreement and the Basic Documents, the entire agreement of the par-

ties hereto with respect to the subject matter hereof, all prior agreements or understandings having been merged herein. No discussions or negotiations relating to the Project are of any further force or effect to modify, discharge or terminate this Agreement.

*Amended LRA § 17 (Exhibit D attached to UDC Motion to Dismiss).*

Whether a contract is ambiguous is a question for the court. *Van Wagner Advertising Corp. v. S & M Enters.*, 67 N.Y.2d 186, 501 N.Y.S.2d 628, 492 N.E.2d 756, 758 (N.Y.1986). The Court finds the language of the Amended LRA to be unambiguous. It unequivocally supersedes all prior understandings between the parties. The Amended LRA states that the parties agreed to modify the original LRA to settle disputes between the parties arising out of the implementation of certain LRA provisions with respect to the Dow Litigation and Sarabond Settlement. *See Amended LRA, Preliminary Statement (Exhibit D attached to UDC Motion to Dismiss).* The Dow Litigation is, therefore, part of the subject matter in the Amended LRA. The Amended LRA states that it, the LRA, and the Basic Documents constitute the entire agreement with respect to the subject matter contained in the documents, including the Dow Litigation.[9] *See Amended LRA § 17 (Exhibit D attached to UDC Motion to Dismiss).* The Amended LRA thus sets forth UDC's responsibilities with regard to the Sarabond Settlement. The Debtors transferred their rights to their Sarabond Settlement share to UDC. The Amended LRA does not require UDC to prepay the Settlement proceeds to HUD in satisfaction of the HUD Note by a date certain.

*See Amended LRA § 10 (Exhibit D attached to UDC Motion to Dismiss).* The payment just had to be their first priority. *See id.*

A merger clause, such as the one in the Amended LRA, is designed to avoid the confusion created when parties may have several agreements or contracts between them prior to completing a written agreement. *Hoeker v. Dep't of Social & Rehab. Servs.*, 171 Vt. 620, 765 A.2d 495, 498–99 (2000). Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement. *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir.1997).

However, UDC and the Debtors did not just have a creditor-debtor relationship. A POA creates a fiduciary relationship between the principal and the agent. *In re Garson*, 2 Misc.3d 847, 774 N.Y.S.2d 644, 646 (N.Y.Sup.Ct.2003); *In re Guardianship of Kent*, 188 Misc.2d 509, 729 N.Y.S.2d 352, 353 (N.Y.Sup.Ct.2001). By executing a POA, the Debtors clearly had the intent that UDC, as the attorney-in-fact, would utilize the power for the Debtors' benefit. *See Moglia v. Moglia*, 144 A.D.2d 347, 533 N.Y.S.2d 959, 960 (N.Y.App.Div.1988). The attorney-in-fact has a duty to act with utmost good faith in accordance with principles of moral fidelity, loyalty, and fair dealing. *Semmler v. Naples*, 166 A.D.2d 751, 563 N.Y.S.2d 116, 117 (N.Y.App.Div.1990), *appeal dismissed* 77 N.Y.2d 936, 569 N.Y.S.2d 607, 572 N.E.2d 48 (N.Y.1991). However, the United States District Court of the Southern District of New York has held that while in general a written POA is a formal contract

---

**9.** The LRA defined the term "Basic Documents." It refers to documents comprising transactions in connection with the development, acquisition and construction of Kenne-

dy Plaza. *See Exhibit B "Schedule of Basic Documents" of the LRA (Exhibit B attached to UDC Motion to Dismiss).*

and creates a principal/agent relationship, an agency relationship only exists if the agent acts primarily for the benefit of the principal and not for himself. *Northwestern Nat'l Ins. Co. v. Alberts,* 769 F.Supp. 498, 508 (S.D.N.Y.1991). The Debtors though, have alleged sufficient facts supporting their claim that a fiduciary relationship existed to survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss.

Given these circumstances, the Court cannot say that the parties were operating at arms length when they entered into the Amended LRA. The Debtors had reposed their confidence in UDC managing the Dow Litigation and conserving any Settlement Proceeds for them. UDC had settled the Dow Litigation on behalf of SSA and the other Dow Litigation plaintiffs and it was still holding the Settlement Funds in trust for the Debtors when the parties signed the Amended LRA. The Debtors allege that at the time of the Settlement Agreement (which included the Amended LRA), UDC orally advised the Debtors of the requirement to pay UDC $2,173,809 of the Debtors' Sarabond Settlement share, which UDC would in turn use to pay the HUD Note *immediately* as the first priority distribution under the Amended LRA. The question for the Court is whether the parol evidence rule would bar the Court from considering this oral statement at the time of trial.

 In *Battery S.S. Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 738 (2d Cir. 1975), the court said that the parol evidence rule is generally defined as the following: "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the

writing." (quoting 3 A. Corbin, Contracts, s 573, at 357 (1960)). But the court went on to note that the parol evidence rule does not apply to questions over whether a contract is void, voidable, or reformable because of "illegality, fraud, mistake or any other reason and on whether or not parties assented to a particular writing as the complete and accurate 'integration' of their contract..." *Id.* at 739–40. The court quoted again from Corbin and indicated that "[n]o one of these issues can be determined by mere inspection of the written document." *Id.* A party may thus introduce evidence of a fraudulent oral misrepresentation to avoid the contract. *See Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993); *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908–909 (N.Y.1957). Therefore, the Amended LRA's merger clause does not shield UDC from questions over whether its oral statement fraudulently induced the Debtors into signing the Amended LRA. *See Sabo v. Delman,* 164 N.Y.S.2d 714, 143 N.E.2d at 908–909; *Caramante v. Barton,* 114 A.D.2d 680, 494 N.Y.S.2d 498, 500 (N.Y.App.Div.1985). The Court cannot grant UDC's Motion to Dismiss because there is a triable issue of fact as to whether UDC fraudulently induced the Debtors into signing the Amended LRA based upon the Debtors' belief that UDC would repay HUD immediately.

### 5. Accounting

 The Debtors' second cause of action asks the Court to order UDC to provide an accounting of the Debtors' Sarabond Settlement share in UDC's possession. A six-year statute of limitations governs this cause of action. *Nobile v. Schwartz,* 265 F.Supp.2d 282, 289 (S.D.N.Y.2003); *In re Rodken,* 270 A.D.2d 784, 705 N.Y.S.2d 429, 430 (N.Y.App.Div. 2000). Such a claim does not accrue until

the trustee openly repudiates its fiduciary obligation or there is a judicial settlement of the fiduciary's account. *See In re Barabash's Estate*, 334 N.Y.S.2d 890, 286 N.E.2d at 270; *Estate of Winne*, 232 A.D.2d 956, 649 N.Y.S.2d 210, 211 (N.Y.App.Div.1996). It was not until December of 1998 or later (the Court does not know the exact date), when UDC admitted that it had not used the Settlement Proceeds to pay off the HUD Note. The Debtors sought an accounting in their Adversary Complaint, dated August 6, 2004, which is therefore timely.

■ A complaint in an equitable action for an accounting must show: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him the burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal. *Pressman v. Estate of Steinvorth*, 860 F.Supp. 171, 179 (S.D.N.Y.1994); *300 Broadway Realty Corp. v. Kommit*, 37 Misc.2d 325, 235 N.Y.S.2d 205, 206 (N.Y.Sup.Ct.1962). The Debtors' complaint shows that a fiduciary relationship existed between the Debtors and UDC; the POAs entrusted the Settlement Proceeds to UDC; and the Debtors unsuccessfully requested an accounting from UDC. The Debtors assert that UDC created a fiduciary relationship by contract when UDC required and accepted the reinstatement of the POA as a condition to entering into the Amended LRA. *See Debtors' Supplemental Memorandum of Law in Opposition to UDC's Motion to Dismiss, p. 3.* As to the existence of a legal remedy, New York's statute of limitations would time-bar a damages suit for breach of contract. *See NYCPLR § 214(4).* Such a remedy is therefore not available. Moreover, the New York State Supreme Court has held that "even though [a] plaintiff may have a legal remedy, she is not precluded from seeking equitable relief by way of an accounting predicated upon the existence of a fiduciary relationship." *Darlagiannis v. Darlagiannis*, 48 A.D.2d 875, 369 N.Y.S.2d 475, 476 (N.Y.App.Div. 1975). At this stage of the litigation, the Court will not dismiss the Debtors' claim for an accounting.

ORDERED that UDC's Motion to Dismiss is denied as to the first and second causes of action contained in the complaint.